# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VALUE DRUG COMPANY and ROCHESTER DRUG CO-OPERATIVE, INC. on behalf of themselves and all others similarly situated, <br><br>                        Plaintiffs, <br><br>            v. <br><br> ABBVIE INC., ABBOTT LABORATORIES, UNIMED PHARMACEUTICALS LLC, and BESINS HEALTHCARE, INC. <br><br>                  Defendants. | Case No._____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Value Drug Company, maintaining its principal place of business at the address set forth in paragraph 15, and Rochester Drug Co-Operative, Inc., maintaining its principal place of business at the address set forth in paragraph 16 (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, for its Complaint against Defendants AbbVie Inc., Abbott Laboratories ("Abbott"), Unimed Pharmaceuticals LLC ("Unimed") (collectively, "AbbVie"),[1] and Besins Healthcare Inc. ("Besins") (the term "Defendants" refers to AbbVie and Besins collectively), allege as follows based on: (a) personal knowledge; (b) investigations of counsel; (c) the Memorandum Opinion on Summary Judgment in *FTC v. AbbVie Inc.*, No. 14-5151, 2017 WL 4098688 (E.D. Pa. Sept. 15, 2017) (ECF No. 300) ("SJ Op.") (attached hereto as Exhibit A); (d) the Findings of Fact and Conclusions of Law issued by the United States District

---

[1] This Complaint will use the term "AbbVie" to refer to AbbVie or its predecessors-in-interest, including Abbott and Unimed. The Complaint will use the terms "Abbott" and "Unimed" to refer to those entities if the Complaint is referring to an action one of those entities took at a point in time prior to their acquisition by AbbVie.

Court Judge Harvey Bartle III following a three-week trial in *FTC v. AbbVie*, dated June 29,

2018  (attached hereto as Exhibit B);  and (e) information and belief.

## I.    NATURE OF THE ACTION

1.    This is a civil antitrust action seeking treble damages arising out of Defendants'

unlawful scheme to monopolize the market in the United States for branded and generic

versions of AndroGel.  AndroGel is a FDA-approved prescription testosterone gel for the

treatment of hypogonadism, a clinical syndrome that results from failure of a man's body to

produce adequate amounts of testosterone.  AndroGel 1% was one of AbbVie's "flagship"

products, which prior to the entry of generic equivalents in December 2014, generated

approximately $1 billion in net sales annually for Defendants.

2.    AbbVie and Besins together own U.S. Patent No. 6,503,894 ("'894 patent"),

which Defendants contend protects AndroGel 1% until its expiration in 2020.

3.    Recognizing the huge market potential for AndroGel, generic manufacturers Teva

Pharmaceuticals USA, Inc. ("Teva") and Perrigo Company plc ("Perrigo") each developed

generic versions of AndroGel 1% that designed around the '894 patent – *i.e.* they did not use

isopropyl myristate ("IPM") as the penetration enhancer for their generic products as required

by each of the '894 patent's claims.  According to the '894 patent, a penetration enhancer "is an

agent known to accelerate the delivery of the drug through the skin."  Perrigo developed a

product that was similar to AndroGel 1% in most respects, except that it used isostearic acid

("ISA"), rather than IPM, as the penetration enhancer.  Teva's product used isopropyl palmitate

("IPP") rather than IPM as its penetration enhancer.

4.    Because Teva's and Perrigo's proposed generic AndroGel 1% products used

different penetration enhancers than branded AndroGel, they were required (due to a citizen's

petition) to seek FDA approvals by filing section 505(b)(2) New Drug Applications ("505(b)(2) applications").   As explained below, Teva and Perrigo notified Defendants through Paragraph IV notification letters that their respective proposed products did not infringe the '894 patent.

5.      Faced with the near-term possibility of competition to AndroGel from Teva's and Perrigo's products, AbbVie and Besins filed sham patent litigation, suing Perrigo as well as Teva for alleged infringement of the '894 patent in order to forestall the possibility of generic competition by triggering automatic 30-month stays on the FDA's authority to approve Teva's and Perrigo's products.

6.      AbbVie and Besins filed patent infringement lawsuits even though Teva's and Perrigo's products are clearly outside the literal scope of the '894 patent; each product contains a penetration enhancer other than IPM, the penetration enhancer required by each of the claims in the '894 patent. AbbVie and Besins had no reasonable basis to contend that Teva's and Perrigo's penetration enhancers are equivalent to IPM and thus covered by the '894 patent under the doctrine of equivalents. First, Unimed and Besins had surrendered Teva's and Perrigo's penetration enhancers while prosecuting the '894 patent before the U.S. Patent and Trademark Office ("PTO") in order to obtain the '894 patent. Defendants are therefore precluded from arguing equivalence under the well-settled doctrine of prosecution history estoppel.  Second, Unimed and Besins disclosed but did not claim Teva's and Perrigo's penetration enhancers in the '894 patent and therefore dedicated them to the public.[2]

7.      Moreover, while attempting to obtain a patent using Perrigo's penetration enhancer at the PTO, Defendants took precisely the opposite position than they took in the

---

[2] The claims of the '894 patent are also invalid, unenforceable and did not cover AndroGel or generic versions of AndroGel for additional reasons unrelated to the identity of the penetration enhancer.

patent litigation. For example, Defendants represented to the PTO that ''testosterone gel products with different penetration enhancers cannot be demonstrated as substantially equivalent, i.e., similar compositions'' and that Perrigo's penetration enhancer "is not equivalent to and substitutable for" the penetration enhancer claimed in the '894 Patent.

8.      Teva and Perrigo both recognized that any claim asserting that their products infringed the '894 patent was without merit. In the patent litigation, Teva counterclaimed that the lawsuit brought by Defendants was anticompetitive and a sham. Similarly, Perrigo notified Defendants that Perrigo's product was outside the scope of the '894 patent and that filing an infringement lawsuit would be a sham.

9.      As a result of Defendants' conduct, competition to AndroGel from Perrigo – which would have begun at least as early as June 2013 but for Defendants' sham lawsuits – did not actually occur until December 27, 2014, forcing Plaintiffs and the class of direct purchasers to pay substantially higher prices during and after this period, and to pay substantially higher prices for generic AndroGel 1% once generic entry finally occurred.  Additionally, this conduct has further harmed Plaintiffs and the proposed Class identified below because it has allowed AbbVie to shift a significant amount of sales from AndroGel 1%, the original dosage strength of the drug, to AndroGel 1.62%, a reformulated product that is not subject to automatic substitution with generic AndroGel 1% products.

10.      Moreover, Defendants likely would have launched an authorized generic equivalent of AndroGel 1% on or around the date Perrigo would have launched, which would have caused prices for generic AndroGel 1% to be lower than they actually were after Perrigo belatedly entered in December 2014. As a matter of pharmaceutical economics, prices fall most dramatically when two or more generic equivalents of a drug are on the market alongside a

brand name product. Plaintiffs would have paid even lower prices - on both brand name AndroGel and its generic equivalents - than they actually paid but for Defendants' unlawful conduct. An "authorized generic" is the same as the brand, and launched under the brand's New Drug Application, but priced like a generic. Brand companies often launch authorized generics to retain some revenue they would otherwise lose to generic competition. Defendants likely would have launched an authorized generic version of AndroGel 1% whenever another AB-rated generic product would have entered, whether in June 2013, or at another time (including earlier). Thus, there would have been at least one additional generic version of AndroGel 1% on the market no later than June 2013, in addition to Perrigo, but for the unlawful conduct alleged in this complaint.

## II.     JURISDICTION AND VENUE

11.     This Complaint is filed and these proceedings are instituted under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class resulting from violations by the Defendants, as herein alleged, of Section 2 of the Sherman Act, 15 U.S.C. § 2. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

12.     Defendants transact business within this judicial district, and the interstate trade and commerce, hereinafter described is carried out, in substantial part, in this district. Venue, therefore, is appropriate within this district under 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

13.     Section 5 of the Clayton Act, 15 U.S.C. § 16(i) tolls the limitations period for private antitrust actions during the time that a related government case is pending: "Whenever

any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter."

14.     The Federal Trade Commission ("FTC") filed a civil proceeding against the Defendants named in this action in this Court on September 26, 2014. *See FTC v. AbbVie,* 2:14-cv-0515-HB (E.D. Pa.) (ECF No. 1), concerning violations of the antitrust laws based on the conduct alleged in this Complaint.  Courts routinely apply § 16(i) to actions initiated by the FTC. *See Minn. Min. and Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 321-22 (1965).

### III.    THE PARTIES

15.     Plaintiff Value Drug Company is a corporation organized under the laws of the State of Pennsylvania and is located at 195 Theatre Drive, Duncansville, Pennsylvania 16635. During the relevant period, Plaintiff Value Drug Company purchased AndroGel 1% and AndroGel 1.62% directly from AbbVie, and purchased generic AndroGel directly, during the Class Period as defined below, and was injured by the illegal conduct alleged herein.

16.     Plaintiff Rochester Drug Co-Operative, Inc. is a stock corporation duly formed and existing under the New York Cooperative Corporation Law that maintains its principal place of business at 50 Jet View Drive, Rochester, New York 14624.   During the relevant period, Plaintiff Rochester Drug Co-Operative, Inc., purchased AndroGel 1% and AndroGel 1.62% directly from AbbVie, and purchased generic AndroGel directly during the Class Period as defined below, and was injured by the illegal conduct alleged herein.

17.    Defendant Abbott Laboratories (together with its affiliates, "Abbott") is a publicly traded, for-profit company incorporated in Illinois with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064. On January 1, 2013, Abbott separated into two independent, publicly traded companies -- Abbott and AbbVie Inc. -- through the distribution of 100 percent of the issued and outstanding common stock of AbbVie Inc. to Abbott's shareholders. Abbott is a diversified medical products company engaged in the business of, among other things, developing, manufacturing, marketing, and distributing medical devices, diagnostic systems and tests, and nutritional products. Prior to January 1, 2013, Abbott's portfolio of products included brand-name pharmaceuticals, including AndroGel. In the twelve months ending December 31, 2012 (the last year before AbbVie's separation), Abbott had net sales of approximately $30.9 billion.

18.    Defendant AbbVie Inc. (together with its affiliates, including its predecessors-in-interest Defendants Unimed and Abbott, "AbbVie") is incorporated in Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie has existed since January 1, 2013, as a publicly traded research-based pharmaceutical company with Abbott's former portfolio of proprietary pharmaceuticals and biologics. AbbVie includes the former entities Solvay Pharmaceuticals, Inc. and Solvay Pharma U.S. Holdings, Inc., which Abbott acquired in 2010, as well as Abbott Products, Inc. and Abbott Products U.S. Holdings, Inc. Except where otherwise specified, hereinafter "AbbVie" refers to AbbVie and all corporate predecessors and affiliates. AbbVie is engaged in the business of, among other things, developing, manufacturing, marketing, distributing, and selling brand-name pharmaceutical products, including AndroGel. In the twelve months ending December 31, 2013, AbbVie had

7

net sales of approximately $18.8 billion, of which more than $1 billion were U.S. sales of AndroGel 1% and 1.62%.

19.     Defendant Unimed Pharmaceuticals, LLC (together with its affiliates, "Unimed"), a wholly-owned subsidiary of AbbVie, is a corporation organized and existing under the laws of Delaware, with its headquarters and principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

20.     Defendant Besins Healthcare Inc. (together with its affiliates, "Besins") is a for-profit corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 607 Herndon Parkway, Suite 210, Herndon, Virginia 20170. Besins includes the former entities Laboratoires Besins-Iscovesco and Besins-lscovesco U.S., Inc. Besins is a wholly-owned subsidiary of Besins Healthcare S.A., a privately held corporation with its headquarters in Bangkok, Thailand. Besins is engaged in the business of, among other things, developing, manufacturing, marketing, and distributing brand-name pharmaceutical products. Under an agreement with AbbVie, Besins manufactures AndroGel and receives a share of the profits from U.S. sales.

21.     All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in conducting Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

## IV.    CLASS ACTION ALLEGATIONS

22.      Plaintiffs bring this action on behalf of themselves and, under Rule 23 of the

Federal Rules of Civil Procedure, as representatives of a class defined as follows:

> All persons or entities in the United States, including its territories,
> possessions, and the Commonwealth of Puerto Rico, who purchased
> AndroGel 1% and/or AndroGel 1.62% in any form directly from
> AbbVie, or who purchased generic AndroGel 1% directly, at any
> time during the period from June 4, 2013 until August 31, 2017 (the
> "Class Period").  Excluded from the Class are Defendants and their
> officers, directors, management and employees, predecessors,
> subsidiaries and affiliates, and all federal governmental entities.

23.      Members of the Class are so numerous that joinder is impracticable.  While the

exact number of Class members is unknown to Plaintiffs, it is believed to be at least several

dozen.  Further, the Class is readily identifiable from the information and records in Defendants'

possession.

24.      Plaintiffs' claims are typical of the members of the Class.  Plaintiffs and all

members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they

paid artificially inflated prices for their AndroGel 1%, generic AndroGel 1%,  and/or AndroGel

1.62% purchases, and were deprived of the benefits of competition from a less-expensive generic

equivalent of AndroGel 1% as a result of Defendants' anticompetitive conduct.

25.      Plaintiffs will fairly and adequately protect and represent the interests of the

Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

26.      Plaintiffs are represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation, particularly class action antitrust litigation in the

pharmaceutical industry.

27.      Questions of law and fact common to members of the Class predominate over

questions, if any, that may affect only individual Class members because Defendants have acted

on grounds generally applicable to the entire Class.  Such generally applicable questions are inherent in Defendants' wrongful conduct.

28.    Questions of law and fact common the Class include:

    a.  Whether the conduct alleged herein constitutes a violation of the antitrust laws;

    b.  whether Defendants' infringement lawsuits against Teva and Perrigo regarding the '894 patent were sham litigation;

    c.  whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Defendants' power to exclude generic competition and charge supra-competitive prices for AndroGel 1% and AndroGel 1.62%;

    d.  if a relevant market needs to be defined, the definition of the relevant market for analyzing Defendants' monopoly power, and whether Defendants had monopoly power in the relevant market;

    e.  whether Defendants illegally maintained their monopoly power in the relevant market;

    f.  whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

    g.  whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of its direct purchaser customers and if so, the appropriate measure of damages.

29.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that may not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

30.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V.     FACTUAL ALLEGATIONS

### A.     The Regulatory Structure for Approval of Drugs.

31.     The approval of brand-name and generic drugs is governed by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.,* as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which are commonly known as the "Hatch-Waxman" Act, 21 U.S.C. § 355 and § 271.  *See* Pub. L. No. 98-417, 98 Stat. 1585.

32.     A drug manufacturer seeking to market a new drug must obtain approval from the FDA.  *See* 21 U.S.C. §355(a).  There are three pathways established by the FDCA and Hatch-Waxman: (1) a section 505(b)(1) New Drug Application ("NDA"); (2) a section 505(b)(2) application, and (3) a section 505(j) Abbreviated New Drug Application ("ANDA").

33.     An NDA is a full-length application containing information on the drug's safety and efficacy, an explanation of the drug's ingredients, a description of the methods used in the manufacture and packaging of the drug, samples of the proposed labeling, and samples of the drug.  *See id.* § 355(b)(1). The NDA must also contain a list of any patents covering the drug.  *Id.*

34.     Once the FDA has approved a brand manufacturer's NDA, the brand manufacturer must list in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (called the "Orange Book") any patent that it certifies (1) claims either the approved drug product or approved methods of using the drug product and (2) could reasonably be asserted against a generic manufacturer who makes, uses, or sells the drug product without authorization prior to the expiration of the listed patent(s).  Any patent issued after NDA approval must be listed in the Orange Book within 30 days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

35.     The FDA relies completely on the brand manufacturer's certification about its patents, as the FDA does not have the resources or authority to verify for accuracy or trustworthiness the manufacturer's assertions regarding its patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

36.     Once the FDA has approved a brand-name drug (also referred to as the Reference Listed Drug), an applicant seeking to market a generic version of that drug can obtain approval through the use of abbreviated procedures.  *See* 21 U.S.C. § 355(j). Most commonly, the generic applicant will file a section 5050(j) ANDA stating, among other things, that the generic has the same active ingredient and is biologically and pharmacologically equivalent to the brand-name drug. *Id.* at §355(j)(2)(A).  The generic applicant may then rely on the safety and efficacy data contained in the NDA for the brand-name drug.  *Id.*

37.     A generic drug with slight modifications from the brand-name drug may file a section 505(b)(2) application, which is a hybrid between an ANDA and a full NDA.  *See* 21 C.F.R. § 314.54.  The applicant must submit additional data to the FDA demonstrating that any differences between the brand-name drug and the generic will not affect safety and efficacy but

12

can otherwise avoid the other clinical studies necessary for a full NDA application. *Id.*; *see also Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 227 (3d Cir. 2013).

38.    Congress enacted Hatch-Waxman to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide. Congress also included provisions allowing for the extension of patent terms to recover time spent developing new pharmaceutical products, thereby bolstering pharmaceutical companies' financial incentives to create new and innovative products.

39.    Hatch-Waxman achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic revenues for brand name pharmaceutical companies. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion; by 2013, total prescription drug revenue had climbed to more than $329.2 billion, with generic drugs accounting for 86% of prescriptions.[3] Generics are now dispensed 95% of the time when a generic form is available.[4]

**B.    Mechanism for Brand and Generic Drug Manufacturers to Resolve Patent Disputes.**

40.    The Hatch-Waxman Act also provides specialized procedures for parties to resolve intellectual property disputes.

41.    To obtain FDA approval of an ANDA or a section 505(b)(2) application prior to the expiration of a patent listed in the Orange Book, a generic manufacturer must certify that the generic drug proposed in its application will not infringe any valid patents listed by the brand-name manufacturer in the Orange Book for the brand name drug. Under Hatch-Waxman, a

---

[3] *See* IMS INSTITUTE FOR HEALTHCARE INFORMATICS, MEDICINE USE AND SHIFTING COSTS OF HEALTHCARE, at 30, 51 (Apr. 2014).
[4] *Id.* at 51.

generic applicant's ANDA or section 505(b)(2) application must contain one of four
certifications:

    a.   that no patent for the brand drug has been filed with the FDA (a "Paragraph I
certification");

    b.   that the patent for the brand drug has expired (a "Paragraph II certification");

    c.   that the patent for the brand drug will expire on a particular date and the
generic company does not seek to market its generic product before that date
(a "Paragraph III certification"); or

    d.   that the patent for the brand drug is invalid, unenforceable, and/or will not be
infringed by the generic manufacturer's proposed product (a "Paragraph IV
certification").

42.    The filing of an ANDA or section 505(b)(2) application with a Paragraph IV
certification gives rise to a cause of action for patent infringement pursuant to 35 U.S.C. §
271(e)(2).

43.    If a generic manufacturer files a paragraph IV certification that the listed patent is
invalid, unenforceable, and/or will not be infringed, it must serve timely notice to the brand
manufacturer.  The notice often includes an offer of confidential access whereby outside counsel
for the patent holder may review the generic applicant's application to facilitate a determination
regarding infringement litigation.

44.    If the brand manufacturer initiates a patent infringement action against the generic
filer within 45 days of receiving notice of the Paragraph IV certification, the FDA will not grant
final approval to the ANDA or section 505(b)(2) application until the earlier of (a) the passage of
thirty months (the "30-month stay"), or (b) the issuance of a decision by a court that the patent is

invalid or not infringed by the generic manufacturer's ANDA or section 505(b)(2) application. The FDA may grant tentative approval to a generic application containing a Paragraph IV certification when it determines that the application would otherwise be ready for final approval but for the existence of a patent or regulatory exclusivity, such as the 30-month stay.

45.     If a brand manufacturer does not bring suit within 45 days of receiving notification of the Paragraph IV certification, it can still bring suit later, but it will not be entitled to a 30-month stay, and the FDA will not be prevented from granting final approval to the application assuming other regulatory requirements are satisfied.

**C.     The Competitive Effects of AB-Rated Generic Competition.**

46.     Once the FDA approves a generic drug, the applicant may request from the FDA a therapeutic equivalence ("TE") rating.  A TE rating is a code that reflects the FDA's determination regarding whether a generic product is pharmaceutically and biologically equivalent to the referenced-listed drug.  Products that are determined to be therapeutically equivalent are assigned an "A" or "AB" rating.  Generic products for which therapeutic equivalence cannot be determined are assigned a "B" or "BX" rating.

47.     "A" or "AB" rated generic versions of brand drugs are determined by the FDA to be just as safe and effective as their brand counterparts.  The only material difference between and "A" or "AB" rated generic and its corresponding brand version is price.  Because "A" or "AB" rated generic versions of a corresponding brand drug product are commodities that cannot be differentiated, the primary basis for generic competition is price.  On average, generics are around 30% less expensive than their brand counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are

multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

48.     Since the passage of the Hatch-Waxman Amendments, every state has adopted laws that either require or permit pharmacies to automatically substitute "A" or "AB" rated generic equivalents for brand prescriptions (unless the prescribing physician has specifically ordered otherwise). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of "A" or "AB" rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic equivalent hits the market, the generic quickly captures sales of the corresponding brand drug, often capturing 80% or more of the brand's sales within the first six months.

49.     Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[5] In a 2010 study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand drug sales and (with multiple generics on the market) prices had dropped 85%.[6] As a result, competition from "A" or "AB" rated generic drugs is viewed by brand drug companies as a grave threat to their bottom line.

---

[5] *See, e.g.,* Patricia Danzon & Li-Wei Chao, Does Regulation Drive Out Competition in Pharmaceutical Markets?, J.L. & ECON. (Oct. 2000); Tracy Regan, Generic Entry and Price Competition in the Prescription Drug Market--18 Years after the Waxman-Hatch Act (Univ. of Miami, Dep't of Econ., Working Paper, Feb. 14, 2004); R. Frank, The Ongoing Regulation of Generic Drugs, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

[6] See FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS (Jan. 2010) ("FTC Pay-for-Delay Study), available at http://www.ftc.gov/sites/default/files/documents/reports/paydelay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staffstudy/100112payfordelayrpt.pdf (last accessed June 30, 2018).

50.    Generic competition enables all members of the proposed Class to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.

51.    Once exclusivity is lost and generic entry occurs – an event sometimes referred to as the "patent cliff" – the brand manufacturer can expect a significant drop in profits, as it is forced to either compete by dramatically lowering prices, or accept dramatically lower sales. The tradeoff of longer exclusivity rights in return for quick an effective generic entry after loss of exclusivity was fundamental to the policies and procedures that Congress established in the Hatch-Waxman Act, and embraced by the stated in their generic substitution laws.  According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies.  Even more billions are saved when hospitals use generics.[7]

52.    Until an "A" or "AB" rated generic version of the brand drug enters the market, however, there is no therapeutically equivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices.  Brand manufacturers, such as Defendants, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to stall the impact of generic competition for as long as possible, sometimes (as here) resorting to illegal means.

**D.    AndroGel**

53.    AndroGel is a brand-name transdermal testosterone gel product approved by the FDA for the treatment of hypogonadism, a clinical syndrome that results from failure of a man's body to produce adequate amounts of testosterone. It is estimated that this condition affects 2-

---

[7] FDA WEBSITE, GENERIC DRUGS UNDERGO RIGOROUS FDA SCRUTINY, available at https://www.fda.gov/ForConsumers/ucm340343.htm (last accessed June 30, 2018).

6% of the adult male population in the United States.[8] Patients with hypogonadism are typically treated with testosterone replacement therapy ("TRT") whereby exogenous testosterone is administered.

54.    As Judge Bartle found, the first TRTs approved by the FDA were injectables in which testosterone is dissolved in a liquid and then injected into a muscle of the body. Injectable testosterones were introduced in the 1950s and have been available in generic form for decades. They are administered every one to three weeks. While many patients receive injections at their doctors' office, some patients opt to self-administer injections at home or visit clinics specializing in TRT commonly known as "Low-T" centers.  Testosterone injections typically require two needles: a withdrawal needle and an injection needle. Because a deep intramuscular injection is required, this treatment method may cause pain and discomfort which will vary from patient to patient. Injectables generally provide an initial peak in testosterone level at the time of injection followed by troughs or valleys as the injection wears off. This variation in testosterone level may cause swings in mood, libido, and energy.

55.    TRTs may also be administered through a gel or patch which is applied to the skin and thereby absorbed into the bloodstream. This group of products is known as topical testosterone replacement therapies or transdermal testosterone replacement therapies ("TTRTs").

56.    AndroGel 1% was launched in 2000 as the first FDA-approved testosterone gel. It is applied once a day to one or more application sites, including the upper arms, shoulders, and abdomen. AndroGel comes in two strengths: (1) 1%, which was the original formulation

---

[8] Hypogonadism is a lifelong condition which causes decreases in energy and libido, erectile dysfunction, and changes in body composition including decreased bone density.

launched in June 2000; and (2) 1.62%, which was first sold in May 2011. At the time AndroGel

1% came on the market in 2000, it was available only in sachets. In 2004 it became available in

a metered-dose pump. AbbVie discontinued manufacture of the AndroGel 1% pump in

December 2013.

57.    AndroGel 1% was developed through a collaboration between Unimed and

various subsidiaries of Besins' parent company.[9]

58.    Transdermal gels have several advantages over the other forms of TRTs. A gel is

relatively easy for a patient to apply without the potential for pain or discomfort associated with

an injection. It also allows the patient to maintain a relatively steady testosterone level with less

significant peaks and troughs. As compared to the patch form of testosterone, it has a lower rate

of irritation and is not visible.

## VI.    THE NARROW '894 PATENT

59.    Testosterone, the active ingredient contained in AndroGel, is unpatented. Patents

covering the synthesis of artificial testosterone expired decades ago. Testosterone was first

artificially synthesized in 1935 and has been available in various drug products since the 1950s.

Pharmaceutical gel products have also been available for decades.

60.    In August 2000, five years after Unimed licensed AndroGel from Besins,

employees from  Unimed and Besins filed the application that ultimately led to the issuance  of

the '894 patent on January 7, 2003. The '894 patent does not claim testosterone itself or

methods of using testosterone generally, but rather covers the use of particular pharmaceutical

---

[9] At the time of its launch, AndroGel 1% was marketed and distributed by Solvay
Pharmaceuticals, Inc. ("Solvay"), the parent company of Unimed. Abbott Laboratories acquired
Solvay and Unimed in February 2010. At that time Solvay was renamed Abbott Products Inc.

gel formulations containing testosterone and other listed ingredients in certain amounts.

Namely, the patent claims formulations containing specified amounts of (1) testosterone; (2)

ethanol or isopropanol; (3) sodium hydroxide; (4) a gelling agent; and (5) the penetration

enhancer IPM.

61.     All of the claims of the '894 patent require IPM in the compositions,

formulations, or methods of use thereof.

**A.    Unimed and Besins initially sought to include all penetration enhancers in their patent claims.**

62.     Unimed and Besins had to significantly narrow their patent claims over the

course of the '894 patent prosecution, including their claims as to the scope of penetration

enhancers in the formulation, in order to convince the PTO to issue the patent.

63.     In the written description of their invention filed with their original patent

application, Unimed and Besins identified "non-limiting examples" of penetration enhancers

that could be used in a testosterone gel, including "C8-C22 fatty acids such as isostearic acid,

octanoic acid, and oleic acid [and] lower alkyl esters of C8-C22 fatty acids such as ethyloleate

[and] isopropyl myristate. . . ."

64.     In their original patent application, Unimed and Besins sought to include all of

these penetration enhancers – and more – in the scope of their patent claims. In their broadest

form, Unimed and Besins's claims attempted to cover a formulation containing "a penetration

enhancer," along with other ingredients.

65.     In June 2001, the patent examiner rejected the composition claims in Unimed and

Besins's original patent application as obvious over prior art. The examiner stated that prior

publications disclosed both the use of testosterone in pharmaceutical products delivered through

the skin and the use of various penetration enhancers in pharmaceutical compositions. In particular, the examiner cited international patent applications filed by Mak et al. (WO 99/24041) and Allen et al. (WO 96/27372).  These publications collectively disclosed the use of several specific penetration enhancers, including IPM (the penetration enhancer contained in AndroGel), IPP (the penetration enhancer contained in Teva's product), and oleic acid, among others.

**B.      Unimed and Besins next attempted to include a group of 24 penetration enhancers in their patent claims.**

66.      In response to the patent examiner's rejection and to secure allowance of the patent, Unimed and Besins amended their claims on October 19, 2001. The amendment narrowed the broadest claims to a testosterone gel formulation containing at least one penetration enhancer selected from a group of 24 specifically listed compounds and classes of compounds, which included IPM (the penetration enhancer contained in AndroGel) and ISA (the penetration enhancer contained in Perrigo's product) but not IPP (the penetration enhancer contained in Teva's product).

67.      To avoid an obviousness rejection, Unimed and Besins argued that their narrowed claims were patentable because the prior art recognized differences between penetration enhancers and the claimed penetration enhancers were not substitutable with the penetration enhancers disclosed in the prior art.

68.      In their arguments and in a declaration from a company executive, Unimed and Besins also pointed to data showing that the AndroGel formulation unexpectedly displayed a "smooth pharmacokinetic profile" and asserted that this profile had led to AndroGel's commercial success. Unimed and Besins did not file data showing that unexpected results

would be displayed by a testosterone gel formulation containing a penetration enhancer other than IPM.

69.     During a December 6, 2001 interview with the patent examiner, Unimed and Besins discussed the pending claims and the October 19, 2001 amendment. The examiner told Unimed and Besins that two of the 60 pending claims were patentable over prior art. These two claims recited a formulation with only one penetration enhancer, IPM, in specified amounts. Unimed and Besins argued during the interview that another pending claim, listing both IPM and the penetration enhancer lauryl alcohol, was novel and nonobvious, but the examiner did not accept this argument.

**C.     Unimed and Besins finally obtain a patent by limiting their claims to a single penetration enhancer, IPM.**

70.     In response to the patent examiner's rejection and to secure allowance of the patent, Unimed and Besins filed a supplemental amendment on December 21, 2001. The supplemental amendment canceled the prior claims to a testosterone gel formulation containing one of 24 specifically identified penetration enhancers and narrowed the scope of the claimed penetration enhancer to IPM only, the penetration enhancer contained in AndroGel. By disclaiming other penetration enhancers, Unimed and Besins avoided prior art, including Mak et al., cited by the patent examiner of record.

71.     By choosing to claim IPM specifically, Unimed and Besins dedicated to the public the rest of the penetration enhancers they disclosed but did not claim, including "C8-C22 fatty acids such as isostearic acid," the penetration enhancer in Perrigo's product, and "esters of C8-C22 fatty acids" such as IPP, the penetration enhancer in Teva's product.

72.     The PTO issued a Notice of Allowability for the '894 patent on August 13, 2002.

In describing the reasons for allowance, the patent examiner noted that Unimed's and Besins's amendments, including the October 19, 2001 amendment (canceling claims listing "a penetration enhancer") and the December 21, 2001 amendment (canceling claims listing penetration enhancers other than IPM), "all together have been considered and are sufficient to remove the prior art rejection." The examiner further stated that "the prior art does not teach or fairly suggest the instant claimed pharmaceutical composition consisting essentially of the specific ingredients herein in the particular amounts."

73.    PTO issued the '894 patent to Unimed and Besins as co-assignees on January 7, 2003. IPM is the only penetration enhancer included in the claims of the '894 patent and is required by each of those claims.

74.    The '894 patent is listed in the *Approved Drug Products With Therapeutic Equivalence Evaluations* (published by the FDA and commonly known as the "Orange Book") as purportedly covering AndroGel. The patent is scheduled to expire in August 2020.

75.    Defendants are the owners of all rights, title, and interest in the '894 patent.

## VII.    PERRIGO'S AND TEVA'S PRODUCTS

76.    After the '894 patent issued, both Perrigo and Teva, along with its development partner BioSante Pharmaceuticals, developed testosterone gel products that would not infringe that patent.

77.    Perrigo developed a testosterone gel formulation containing ISA, a penetration enhancer not claimed in the '894 patent.

78.    Teva and BioSante developed a testosterone gel formulation containing IPP, a

penetration enhancer not claimed in the '894 patent.

**A.    In 2009, Solvay and Besins decided not to file an infringement suit against Perrigo.**

79.    In December 2008, Perrigo submitted to the FDA two ANDAs for a generic testosterone 1% gel in both pump and packet form. In June 2009, Perrigo sent AbbVie's corporate predecessor Solvay, Unimed, and Besins a paragraph IV notice letter explaining that Perrigo's product did not infringe the '894 patent because it did not contain IPM, the penetration enhancer claimed in the patent. Perrigo also stated in its notices that the prosecution history of the '894 patent would estop Unimed and Besins from filing a patent infringement claim.  Finally, Perrigo offered to provide to outside counsel representing Unimed and Besins confidential access to the full ANDAs.

80.    In response to Perrigo's paragraph IV letter, Solvay, Unimed, and Besins retained patent counsel to review potential bases for a patent infringement lawsuit against Perrigo.

81.    Following patent counsel's review, Solvay, Unimed, and Besins confirmed that Perrigo's ANDA did not contain IPM.  Solvay, Unimed and Besins decided not to file a patent infringement suit against Perrigo. In a July 2009 press release announcing the decision not to sue, Solvay noted that, unlike earlier generic AndroGel products, Perrigo's product "contains a different formulation than the formulation protected by the AndroGel patent" and stated that "[t]his distinction played a role in the company's decision not to file patent infringement litigation at this time."  Besins also determined that it was "standing down" from bringing an infringement suit but did not join in the Solvay press release or issue its own public announcement.

82.    Solvay prepared an internal document to coordinate the communication strategy

regarding its decision not to sue Perrigo. This document included prepared responses to various

potential questions, including:

> **Why didn't the company initiate a patent infringement suit against Perrigo?** We
> conducted a thorough analysis based upon the contents of the Paragraph IV certification
> and the information available to us, *[sic]* determined there was not a sufficient basis for
> filing patent infringement litigation at this time.
>
> **Why not commence patent litigation to trigger the 30-month stay of approval?**
> Solvay Pharmaceuticals takes it *[sic]* obligations under U.S. law very seriously. These
> obligations include certain pleading requirements that must be satisfied prior to initiating
> any litigation, including patent infringement litigation.

**B.      Abbott filed a citizen petition with the FDA, causing Perrigo and Teva to
seek approval of their products through NDA filings.**

83.      Without a 30-month stay of FDA approval in place to forestall Perrigo's market

entry, AbbVie explored other avenues to prevent or limit generic competition. For example,

Abbott created a "Cross Functional Team to explore clinical arguments that the use of Isosteric

*[sic]* Acid as a penetration enhancer may present safety issues different and distinct than those

associated with a penetration enhancer containing Isopropyl Myristate." One of AbbVie's goals

was to persuade the FDA that it should not approve Perrigo's ANDA.

84.      On April 9, 2010, AbbVie submitted a citizen petition to the FDA related to

Perrigo's ANDA. Abbott asked the FDA to require Perrigo, or any other firm seeking approval

for a generic AndroGel product utilizing a penetration enhancer other than IPM, to conduct

additional safety studies and file an NDA rather than an ANDA. According to Abbott, generic

versions of topical drugs containing different inactive ingredients than the brand-name drug pose

"unique scientific challenges" and the FDA could not approve "any pending ANDA for a

product containing a different penetration enhancer than AndroGel."

85.      The FDA largely granted Abbott's petition on October 4, 2010, stating that

specified safety studies would be required for "[testosterone gel] products with penetration enhancers that differ from those used in the [brand-name drug]." The practical effect of this ruling was that Perrigo (and later Teva) had to submit an 505(b)(2) NDA instead of an ANDA and re-certify that its product did not infringe the '894 patent.

86.    Teva and Perrigo performed the required safety studies and submitted 505(b)(2) NDAs to the FDA in January 2011 and July 2011, respectively. The testosterone gel products that were the subject of these NDAs contained penetration enhancers other than IPM, the penetration enhancer claimed in the '894 patent. The formulation for Perrigo's NDA product was almost identical to the formulation for Perrigo's ANDA product – both included ISA as a penetration enhancer.

**C.    Defendants repeatedly claimed that different penetration enhancers are not equivalent.**

87.    In multiple venues between 2003 and at least December 2013, AbbVie and Besins have emphasized the differences between different penetration enhancers contained in testosterone gel formulations.

88.    In 2003, Unimed and Besins sued Watson Pharmaceuticals, Inc. and Paddock Laboratories for alleged infringement of the '894 patent in the U.S. District Court for the District of Northern Georgia after Watson and Paddock filed ANDAs for generic versions of AndroGel containing paragraph IV certifications. Over the course of that litigation, Watson and Paddock asserted that the pharmaceutical formulation claimed in the '894 patent was an obvious variant of formulations disclosed in the prior art.

89.    Unimed and Besins disputed these claims, emphasizing that it was not obvious, but rather inventive, to identify the particular combination of ingredients claimed in the patent

from the many potential combinations of ingredients in the prior art, including many different penetration enhancers. For example, an expert report Unimed and Besins submitted to the district court in the litigation against Watson and Paddock identified the "significant and unpredictable variation associated with the use of different penetration enhancers." The same expert later submitted another report similarly emphasizing that "there are significant differences between each individual drug, each penetration enhancer and the amounts of each ingredient that one could employ."

90.     Unimed and Besins also highlighted differences between penetration enhancers before the PTO. Since at least 2009, Unimed and Besins have made renewed attempts to obtain a patent covering a testosterone gel formulation including ISA, the penetration enhancer contained in Perrigo's generic AndroGel product.

91.     During prosecution of these patent applications, Unimed and Besins have argued to the PTO that IPM (the penetration enhancer claimed in the '894 Patent) and ISA (the penetration enhancer in Perrigo's product) are not equivalent or substitutable as penetration enhancers. For example, Unimed and Besins asserted to the PTO that:

- "[T]estosterone gel products with different penetration enhancers cannot be demonstrated as substantially equivalent;"

- "[I]t is not routine practice to substitute one penetration enhancer for another . . . . [S]uch substitution is not mere optimization [but] requires careful consideration of the type and amount of penetration enhancer since penetration enhancers can irritate the skin;"

- "[A] skilled artisan would not consider the penetration enhancers as simple substitutions. Rather, a skilled artisan would understand that different penetration enhancers vary in the amount and rate of absorption, as well as, the degree of skin irritation and sensitization and pharmacokinetics;" and

- "[ISA] is not equivalent to and substitutable for [IPM]".

92.     AbbVie also stressed to the FDA the importance of differences among alternative penetration enhancers contained in testosterone gels. In its April 2010 citizen petition, Abbott asked the FDA to require safety studies for Perrigo's product and similar products because of the differences in penetration enhancers. On August 18, 2011, Abbott filed a second citizen petition arguing that FDA could not grant an "A" therapeutic equivalence rating to any generic AndroGel product containing a different penetration enhancer, meaning the generic product would not be automatically substitutable for AndroGel. In a supplement to that petition filed on December 11, 2013, AbbVie asserted that "[t]or topical testosterone products, changes in inactive ingredients such as penetration enhancers are material differences."

## VIII.   EXCLUSIONARY CONDUCT THROUGH SHAM LITIGATIONS

93.     Defendants maintained their market and monopoly power in the United States with respect to AndroGel by filing sham lawsuits against potential competitors Teva and Perrigo.

### A.     AbbVie and Besins sued Teva even though Teva's product does not contain IPM.

94.     On March 16, 2011, Teva sent Defendants a notice letter stating that Teva had submitted NDA No. 202763 to the FDA for a testosterone gel product. The letter also stated that Teva's application contained a paragraph IV certification that Teva's product did not infringe the '894 patent. In addition, Teva provided Defendants with an Offer of Confidential Access to Application that allowed them to review Teva's application to confirm that Teva's proposed product did not contain IPM.

95.     Defendants or their representatives received confidential access to parts of Teva's NDA. As a result, Defendants or their representatives learned that the penetration enhancer in Teva's product was not IPM, but rather a different penetration enhancer, IPP.

96.     On April 29, 2011, Defendants filed a patent infringement lawsuit against Teva in the U.S. District Court for the District of Delaware *(Abbott Products, Inc. v. Teva Pharmaceuticals,* No. 1:11-cv-00384-HB). The filing of the lawsuit automatically triggered a 30-month stay of FDA approval of Teva's testosterone gel product.

97.     Defendants have admitted that Teva's product does not literally infringe the '894 patent because the product does not contain IPM, the penetration enhancer required by each of the claims in the patent. Rather, Defendants asserted that Teva's product infringes the patent under the doctrine of equivalents because Teva's penetration enhancer IPP is equivalent to, and insubstantially different from, IPM.

98.     In response to Defendants' complaint, Teva filed antitrust counterclaims. In its counterclaims, Teva asserted that the infringement claims were baseless and a sham because during prosecution of the '894 patent, Unimed and Besins had surrendered patent claims that would have covered a testosterone gel containing IPP. According to Teva, Defendants were therefore plainly precluded under the doctrine of prosecution history estoppel from asserting infringement under the doctrine of equivalents. Since 2006, Teva has been a defendant in scores of patent lawsuits but has rarely advanced allegations of sham or baseless patent infringement.

99.     On August 1, 2011, Teva filed a motion for summary judgment on the issue of prosecution history estoppel. On October 25, 2011, the district court denied that motion as moot because it had scheduled a trial limited to the estoppel issue. The trial was scheduled to begin May 21, 2012, just 13 months after Defendants filed their complaint.

100.    The FDA granted final approval to Teva's product on February 14, 2012, and assigned a BX rating to Teva's product on July 23, 2014.

**B.    AbbVie and Besins sued Perrigo even though Perrigo's product does not contain IPM.**

101.    On July 4, 2011, Perrigo re-filed with the FDA its application for approval of a generic testosterone 1% gel as a section 505(b)(2) NDA. On September 20, 2011, Perrigo sent Defendants a paragraph IV notice letter stating that Perrigo had submitted NDA No. 203098 to the FDA for a testosterone gel product. The letter also stated that Perrigo's application contained a paragraph IV certification that Perrigo's product did not infringe the '894 patent because it did not contain IPM. In its letter, Perrigo made clear its view that any patent infringement suit against Perrigo in connection with Perrigo's ANDA would be "objectively baseless and a sham," particularly in light of Solvay and Besins's prior decision not to sue Perrigo due to the differences between Perrigo's formulation and the patented formulation. Perrigo further asserted that "a bad faith motive for bringing such a suit would be particularly apparent in light of representations and admissions made, *inter alia*, in [Solvay's] Friday, July 17, 2009 press release." Perrigo offered confidential access to certain information regarding the NDA to confirm that Perrigo's proposed product did not contain IPM.

102.    Defendants or their representatives received confidential access to parts of Perrigo's NDA. As a result, Defendants or their representatives learned that – as in Perrigo's earlier generic AndroGel ANDA product – the penetration enhancer in Perrigo's NDA product was not IPM, but rather a different penetration enhancer, ISA.

103.    On October 31, 2011, Defendants filed a patent infringement lawsuit against Perrigo in the U.S. District Court for the District of New Jersey (*Abbott Products, Inc. v. Perrigo Company,* No. 3:11-cv-06357-FLW-LHG). The filing of the lawsuit automatically triggered a 30-month stay of FDA approval of Perrigo's product.

104.    Defendants have admitted that Perrigo's product does not literally infringe the '894 patent because the product does not contain IPM, the penetration enhancer claimed in the '894 patent. Rather, they assert that Perrigo's product infringes the patent under the doctrine of equivalents because Perrigo's penetration enhancer ISA is equivalent to, and insubstantially different from, IPM.

105.    The FDA granted approval to Perrigo's product on January 31, 2013. The FDA assigned an AB rating to Perrigo's product on July 23, 2014, after Perrigo had filed a lawsuit against the FDA in the U.S. District Court for the District of Columbia on March 21, 2014, for failing to make a timely decision on the therapeutic equivalence rating for Perrigo's product. As Judge Bartle found following a three week bench trial, absent Defendants sham patent litigation, Perrigo would have received a ruling on therapeutic equivalence in June 2013 and launched around that time.

**C.        Defendants' lawsuits were sham.**

106.    As Judge Bartle found, Defendants' lawsuits against Teva and Perrigo were without question objectively baseless. Teva's and Perrigo's products are well outside the scope of the '894 patent under any theory of infringement.

107.    The law with respect to sham litigation, the doctrine of equivalents, and prosecution history estoppel was well-settled at the time that defendants filed their lawsuits against Teva and Perrigo in 2011.

108.    The lawsuits against Teva and Perrigo were objectively baseless under the doctrine of prosecution history estoppel. This doctrine with certain exceptions precludes a patentee from claiming equivalents if the patentee surrendered the equivalents for reasons of patentability during the patent prosecution process.

109.    The purpose of prosecution history estoppel is to protect the patentees'
competitors from patent infringement litigation based on the doctrine of equivalents if the
prosecution history demonstrates that an equivalent has been purposefully and not tangentially
excluded from its scope. The patentee has the burden to overcome the presumption of surrender.
Here, any reasonable person who reads the prosecution history of the '894 patent can reach no
other conclusion than that the Defendants have purposefully and not tangentially excluded ISP
and IPA as penetration enhancers equivalent to IPM.

110.    Neither Teva's nor Perrigo's product literally infringes the '894 patent. Each
independent claim of the patent covers only a testosterone gel formulation that contains IPM.
Neither Teva's product nor Perrigo's product contains IPM.   Defendants have admitted that
Teva's and Perrigo's products do not literally infringe the '894 patent.

111.    Neither Teva's nor Perrigo's product infringes the '894 patent under the doctrine
of equivalents. Defendants have asserted that the penetration enhancers used in Teva's and
Perrigo's products (IPP and ISA, respectively) are equivalent to and insubstantially different
from IPM; however, the doctrine of prosecution history estoppel prohibits them from making
this claim. The examiner rejected in June 2001 claim 1 which claimed all penetration enhancers.
In light of this rejection, over the course of their October 2001, December 2001, and February
2002 amendments, Defendants without question narrowed the claimed penetration enhancers in
the '777 application from all penetration enhancers including those used in the Teva and Perrigo
products to only IPM at particular concentrations.  This narrowing of claims was necessary for
Unimed and Besins to distinguish their claimed formulation from prior art and to obtain a
patent.

112.    Both Teva's and Perrigo's penetration enhancers were plainly foreseeable at the

32

time Unimed and Besins amended their claims during prosecution of the '894 patent application. Teva's penetration enhancer was specifically identified in the prior art cited by the patent examiner in the June 2001 office action rejecting all pending claims under consideration, included in a small group of compounds described in the '894 patent specification, and included in the scope of the patent claims contained in Unimed and Besins's original patent application. Perrigo's penetration enhancer was known in the prior art, specifically listed in the '894 patent specification, and specifically listed as one of 24 compounds (or classes of compounds) recited in the October 19, 2001 amendment to Unimed and Besins's patent claims.

113.    The amendments narrowing Unimed's and Besins's patent claims from a group of penetration enhancers to the single penetration enhancer IPM were not tangential to the alleged equivalents. The patent prosecution history clearly indicates that the patent examiner viewed the claims as obvious over the prior art, which disclosed both the use of various penetration enhancers in pharmaceutical products and delivery of testosterone through the skin. As a result of the patent examiner's review of the prior art, Unimed and Besins were forced to limit their patent claims to the use of the penetration enhancer IPM only.

114.    The October 2001 amendment sought to overcome the rejection by narrowing the original claim 1 for all penetration enhancers to only twenty-four. It thereby excluded IPP and countless other penetration enhancers previously rejected. If AbbVie and Besins merely sought to relinquish only certain penetration enhancers in October 2001, they easily could have said so.

115.    In the December 2001 amendment, Defendants disavowed twenty-three of the penetration enhancers listed in the October 2001 amendment, including ISA, when they narrowed the claimed penetration enhancer to IPM.

33

116.     Given that IPP (the penetration enhancer in Teva's product) and ISA (the penetration enhancer in Perrigo's product) were known as available technologies at the time Unimed and Besins filed for a patent, Unimed and Besins had an obligation to claim the technologies if they wanted to later assert exclusive rights to their use in a testosterone gel. Where a patent applicant discloses but does not claim known technology, the technology is dedicated to the public.

117.     No reasonable litigant, having had access to the confidential information Teva and Perrigo provided Defendants, could reasonably have expected to prevail on the merits of a claim that either Teva's product or Perrigo's product infringes the '894 patent. Defendants thus had no probable cause for initiating the lawsuits.

118.     Defendants commenced the lawsuits against Teva and Perrigo with the subjective and wrongful intent to interfere directly with the business relationships of Teva and Perrigo. Defendants filed the lawsuits not to obtain a favorable outcome on the merits of the claims asserted but to achieve an anticompetitive objective and maintain their monopoly position through the improper use of judicial process.

119.     Defendants knew when they filed the lawsuits that the mere filing of the complaints would trigger automatic 30-month stays of FDA approval of Teva's and Perrigo's drug applications and that Defendants would get the benefit of the stays despite the lack of any reasonable basis for asserting that Teva's or Perrigo's products infringe the '894 patent. Even with no realistic chance of winning the lawsuits, the 30-month stays were of tremendous value to Defendants because they blocked entry of Teva's and Perrigo's products and gave Defendants time to shift sales away from AndroGel l% to AndroGel 1.62%, the reformulated

product AbbVie developed.

120.    The attorneys who decided to sue Teva and Perrigo for patent infringement were aware of the Paragraph IV notices from Teva and Perrigo.  In the Paragraph IV notices, Teva and Perrigo declared that their products did not contain as a penetration enhancer IPM in the particular concentration claimed in the '894 patent.  Outside counsel for Defendants had confidential access to the section 505(b)(2) applications of Teva and Perrigo, which included the penetration enhancers used by Teva and Perrigo.  Both Paragraph IV notices called to the attention of the decision-makers that any infringement actions by Defendants would be barred by prosecution history estoppel. Perrigo went so far as to assert that any infringement suit against it would be a sham.

121.    The decision-makers at AbbVie and Besins in 2011 knew that Teva and Perrigo used penetration enhancers for their generic products which were distinct from the one penetration enhancer claimed in the '894 patent. The decision-makers also were aware of the prosecution history of the '894 patent and specifically that the patent application originally claimed all penetration enhancers including those in the Teva and Perrigo products and that those penetration enhancers used by Teva and Perrigo were ultimately excluded from the protection of the '894 patent.  The prosecution history detailed that the original claims covered all penetration enhancers but were ultimately reduced to one, IPM.

122.    The patent attorneys, some of whom were long-time employees, were generally aware of the extensive financial success of AndroGel.  It was no secret that AndroGel was a blockbuster product. It was bringing in hundreds of millions of dollars annually as of 2011 with a very high profit   margin. Sales of AndroGel 1% were $604 million, $726 million, and $874 million in 2009, 2010, and 2011 respectively. The patent attorneys also clearly recognized that

the entry of generic versions of AndroGel with their much lower prices would quickly and significantly erode this ideal financial picture. Their reason and motivation for the filing of these objectively baseless actions against potential competitors was to staunch, at least for a time, this looming loss of revenue.

123.    Since these experienced patent attorneys filed objectively baseless infringement lawsuits, it is reasonable to conclude that they intended the natural and probable consequences of acts they knowingly did. This leads ineluctably to an inference that the subjective intent of the decision-makers was to file sham lawsuits.

124.    Defendants are not entitled to *Noerr-Pennington* immunity in connection with their filing and maintenance of these sham lawsuits.

**D.    The sham lawsuits did not eliminate the threat of Teva's and Perrigo's products to Defendants' monopoly.**

125.    Because Teva's and Perrigo's testosterone gel products were filed with the FDA via 505(b)(2) applications rather than ANDAs, the FDA was obligated under the Prescription Drug User Fee Act ("PDUFA") to process the applications within a set period of time. In Teva's case, the original date for completion of FDA review was November 14, 2011.

126.    Though the FDA was prevented from issuing final approval to Teva's or Perrigo's products due to the 30-month stays triggered by Defendants' sham patent lawsuits, the stay would end upon a victory by the generic firm in the district court. In Teva's case, due to the quick trial schedule set by the district court, Teva was likely to receive final FDA approval in 2012.

127.    Because of this dynamic, AbbVie recognized the threat from Teva's challenge to its monopoly. On August 8, 2011 AbbVie held a meeting that was attended by executives and in-

house attorneys to discuss AndroGel.  This meeting took place shortly after Teva filed its motion for summary judgment in the patent infringement case in which AbbVie had sued it.  During that meeting an executive drew a chart depicting a dramatic erosion of AndroGel sales following entry of an AB-rated generic after a "lost case" eight months hence in April 2012, the month in which the  court had  scheduled a hearing to take place on Teva's summary judgment motion.

128.    Thereafter, AbbVie created "AndroGel Scenarios" with various potential dates for generic entry, including: (1) November 2011, the date by which the FDA had agreed to review Teva's section 505(b)(2) application; (2) April 2012, the  date on which the summary judgment motion could be decided in the Teva matter; and (3) April 2013, an estimate of the date on which a trial on the merits may have concluded in the Teva matter.  In an email on September 30, 2011, an AbbVie executive responsible for the AndroGel franchise, characterized the April 2012 entry date as "[t]he most likely scenario."

129.     With Defendants set to lose the benefit of the 30-month stays their sham lawsuits had triggered, they turned to other ways to preserve their monopoly.

**E.    Defendants' agreement with Teva effectively blocked Perrigo's generic AndroGel entry**

130.    Soon after the district court scheduled a May 2012 trial in their patent case against Teva, AbbVie approached Teva to discuss a potential settlement. AbbVie's goal was to secure a generic entry date that would allow it time to shift sales to its reformulated product, AndroGel 1.62%.

131.    On December 20, 2011, Defendants and Teva entered written agreements to settle their AndroGel patent litigation. Under the settlement, Teva agreed to refrain from marketing its

505(b)(2) testosterone gel product until December 27, 2014.

132.    Almost immediately after filing suit against Perrigo, AbbVie approached Perrigo to discuss a potential settlement.

133.    AbbVie could not directly pay Perrigo to delay generic AndroGel entry due to the terms of a FTC consent order Perrigo had entered in 2011. Defendants could, however, offer Perrigo the right to launch generic AndroGel upon Teva's entry. This term was valuable to Perrigo because Teva appeared more likely than Perrigo to achieve a quick victory in the patent litigation and end the 30-month stay triggered by Defendants' lawsuit. Teva had obtained a quick May 2012 trial date and, as reflected in Teva's sham antitrust counterclaims, seemed likely to press its position and win the case.

134.    Defendants' suit against Perrigo, in contrast, had been filed in a different judicial district and Perrigo believed that its case was unlikely to end before the suit against Teva. A settlement, therefore, provided Perrigo with an opportunity to achieve parity with Teva (that is, the same entry date) without expending any litigation costs. Without a settlement, Perrigo would have been unable to achieve parity with Teva because the 30-month stay blocking FDA approval of Perrigo's product would remain in effect.

135.    On December 8, 2011, Defendants and Perrigo agreed to settle their patent litigation. The terms of the settlement provided that Perrigo could launch generic AndroGel upon the launch of another generic AndroGel product (including Teva's testosterone ·gel product) or no later than January 1, 2015. Perrigo, had been monitoring the Teva litigation and thought Teva would prevail at the trial scheduled for May 2012 and thereafter launch its product, so "that would provide a much earlier Perrigo license date." As a result of the Teva settlement, Perrigo's

licensed entry date was moved up to December 27, 2014 under the acceleration clause.

136.    Perrigo's decision to settle was driven not by the strength of AbbVie's patent claims (which were baseless) but by the competitive position Perrigo found itself in as a result of the 30-month stay triggered by Defendants' sham suit and the opportunity to improve that position by achieving parity with Teva. But as Defendants' knew – and Perrigo did not – they were in the process of negotiating a deal with Teva that would delay Teva's entry well beyond what Perrigo expected.

137.    By securing Teva's agreement to forgo entry, Defendants blocked competition from Perrigo as well. Because of the terms of Perrigo's settlement, the Teva agreement effectively protected Defendants against Perrigo's generic AndroGel entry until December 27, 2014.

## IX.    MARKET POWER AND RELEVANT MARKET

138.    At all relevant times, Defendants had market power  with respect to AndroGel 1% because they had the power to maintain the price of AndroGel 1% at supracompetitive levels without losing substantial sales to other testosterone replacement therapies ("TRTs"). This market power may be shown directly, and therefore no relevant market needs to be defined.

139.    To the extent a relevant product market must be defined, the relevant product market at issue in this case is AndroGel 1%, and AB-rated bioequivalent versions of AndroGel. Even if, *arguendo*, AndroGel 1.62% were considered part of the relevant antitrust market, Defendants still had 100% of that market until Perrigo began to sell generic AndroGel 1%.

140.    A small but significant, non-transitory price increase for branded AndroGel 1% did not cause a significant loss of sales to other medications sufficient to make such a price increase unprofitable.

141.    AndroGel 1% does not exhibit significant, positive cross-elasticity of demand with respect to price, with any product other than AB-rated generic versions of AndroGel 1%.

142.    The FDA does not consider AndroGel 1% and other medications to be interchangeable.

143.    Price does not drive prescriptions for AndroGel 1% or other TRTs. The pharmaceutical marketplace is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including AndroGel, to patients without a prescription written by a doctor. This prohibition introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

144.    Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in product selection.

145.    Defendants needed to control only AndroGel 1% and its AB-rated generic equivalents, and no other products, in order to maintain the price of AndroGel 1% profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of AndroGel 1% would have rendered Defendants unable to profitably maintain its prices of AndroGel 1% without losing substantial sales.

146.    The entry of other brands of TRT medications (or generic versions of those other brands) did not cause Defendants to lower their price.  The entry of other brands of TRT (other than AndroGel 1.62%) did not take substantial sales from AndroGel 1%.  By contrast, the

competitive impact of an AB-rated generic version of AndroGel 1% on brand AndroGel 1% was expected to be and was substantial. Among other things, the entry of an AB-rated generic AndroGel 1% delivered hundreds of millions of dollars of savings to purchasers.

147.    At all relevant times, Defendants sold AndroGel 1% at prices well in excess of the competitive price and enjoyed high profit margins.

148.    At all relevant times, Defendants had, and exercised, the power to exclude and restrict competition to AndroGel 1% and AB-rated bioequivalents.

149.    At all relevant times, Defendants enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

150.    The relevant geographic market is the United States and its territories, possessions and commonwealth of Puerto Rico.

151.    Alternatively, Defendants' market and monopoly power over AndroGel 1% and AB-rated bioequivalent can be shown through circumstantial evidence, including a high share of a relevant market of AndroGel 1% and its AB-rated generic, with substantial barriers to entry.

152.    Alternatively, as Judge Bartle found following the bench trial, empirical, documentary, and other evidence demonstrate that the relevant market for antitrust purposes in this case is no broader than testosterone drugs delivered transdermally (through the skin) and approved by the FDA for sale in the United States, and Defendants had a dominant share in that market during the relevant time period. Other testosterone drugs, such as those delivered by injection, are not close enough substitutes to prevent Defendants and other market participants from profitably raising prices. Substantial barriers to entry exist in the TTRT market, including the need to conduct expensive clinical trials and obtain FDA approval. Even entry of new brand-

name competitors has not significantly eroded Defendants' monopoly.

153.     As Judge Bartle recognized, injectable TRTs (which would have been included in the market Defendants' proposed) are not in the relevant antitrust market.  Defendants' executives testified that injectable patients were "not our [AndroGel] patient type."  Similarly, the Director of Marketing for AndroGel from 2010 through 2014, testified that AbbVie did not consider injectables as competition and that the company believed based on market research that it could not transition injectable patients to AndroGel.

154.     AndroGel 1% and 1.62% total share of the TTRT market was 71.5% at the time that the first sham lawsuit against Teva was filed in April 2011 and 63.6% at the time that the sham lawsuit against Perrigo was filed at the end of October 2011.  Thereafter AndroGel 1% and 1.62% total share remained above 60% until the end of 2014, when Perrigo's generic 1% testosterone product entered the market.  The closest competitor, Testim, had a share of only approximately 20% of the TTRT market at the time of the filing of the first sham lawsuit, but thereafter its share dropped to approximately 12%. Axiron was launched on March 28, 2011 and had captured approximately 14% of the TTRT market by April 2014. No other TTRT product ever held 10% or more of the market during the period from April 2, 2011 through the end of 2014.  Defendants were able to maintain its share of the TTRT market with a profit margin of over 65% during the relevant period. It was also able to increase the wholesale acquisition cost for AndroGel throughout this time period.

## X.     MARKET EFFECTS AND DAMAGES TO THE CLASS

155.     Typically, generic drugs are initially priced significantly below the corresponding brand drug to which they are AB-rated. As a result, upon generic entry, nearly all

brand drug purchases are rapidly substituted for generic equivalents of the drug. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further due to competition among the generic manufacturers.

156.    This price competition enables all purchasers of the drug to: (a) purchase generic versions of a drug at substantially lower prices than the brand; (b) purchase generic equivalents of the drug at a lower price, sooner; and/or (c) purchase the brand drug at a reduced price. Consequently, brand manufacturers have a keen financial interest in delaying and impairing generic competition, and purchasers experience substantial cost inflation from that delay and impairment.

157.    But for the anticompetitive conduct alleged above, as Judge Bartle found, Perrigo would have entered the market with its generic version of AndroGel 1% no later than June 2013. At least one additional generic (likely an authorized generic) would have launched on or about the same time, or earlier (an authorized generic likely would have launched whenever AB-rated generic competition began, whether from Perrigo or another generic company).

158.    A significant portion of AndroGel 1% sales has shifted to AndroGel 1.62% since 2012, a shift made possible by Defendants' anticompetitive conduct. Because Teva and Perrigo's products are not automatically substitutable for brand-name AndroGel 1.62%, purchasers realized fewer benefits than they would have from earlier generic entry.

159.    Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting AndroGel from generic competition.

160.    Both Teva and Perrigo have extensive experience in the pharmaceutical

industry, including in obtaining approval for ANDAs, marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

161.        Defendants' anticompetitive conduct, which delayed introduction into the United States marketplace of generic versions of AndroGel 1%, has caused Plaintiffs and the proposed Class to pay more than they would have paid for AndroGel 1% and 1.62% and generic AndroGel 1% than they would have paid absent Defendants' illegal conduct.

162.        But for Defendants' anticompetitive conduct, Plaintiff and members of the proposed Class would have paid less for AndroGel by: (a) substituting purchases of less-expensive AB-rated generic AndroGel 1% for their purchases of more-expensive branded AndroGel 1% or AndroGel 1.62%; (b) receiving discounts on their remaining brand AndroGel 1% or AndroGel 1.62% purchases; and/or (c) purchasing generic AndroGel 1% at lower prices sooner.

163.        Thus, Defendants' unlawful conduct deprived plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## XI.    ANTITRUST IMPACT

164.        During the relevant period, Plaintiffs and members of the proposed Class purchased substantial amounts of AndroGel 1% and 1.62% directly from Defendants and purchased generic AndroGel 1% directly. As a result of Defendants' illegal conduct, Plaintiff and members of the proposed Class were compelled to pay, and did pay, artificially inflated prices for their AndroGel 1% and 1.62% requirements, and/or for generic AndroGel 1%. Those prices were substantially greater than the prices that plaintiff and members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of AndroGel 1% and 1.62% was artificially inflated by Defendants' illegal conduct, and (2) plaintiff and Class

members were deprived of the opportunity to purchase lower-priced generic versions of AndroGel 1%.

165.        As a consequence, Plaintiffs and members of the proposed Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## XII.    EFFECT ON INTERSTATE COMMERCE

166.        At all material times, AndroGel, manufactured and sold by Defendants, was shipped across state lines and sold to customers located outside its state of manufacture.

167.        During the relevant time period, in connection with the purchase and sale of AndroGel, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

168.        During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. Defendants' activities were within the flow of, and have substantially affected, interstate commerce.

## XIII.   COUNT I

## MONOPOLIZATION - AGAINST ALL DEFENDANTS

169.    Plaintiffs re-allege and incorporate by reference the allegations in all of the paragraphs above.

170.    Defendants' willful maintenance of their monopoly through a course of anticompetitive conduct, including filing sham patent litigation against Teva and Perrigo, constitutes an unfair method of competition in violation of Section 2 of the Sherman Act, 15

U.S.C. § 2.

171.    As a result of this unlawful maintenance of monopoly power, Plaintiffs and members of the Class paid artificially inflated prices for their AndroGel 1% and AndroGel 1.62% requirements, and/or for generic AndroGel 1%.  But for Defendants' illegal conduct, competitors would have begun marketing generic versions of AndroGel 1% before they actually did, and/or would have marketed such versions more successfully than they actually did.

172.    The goal, purpose, and/or effect of Defendants' conduct was to maintain and extend Defendants monopoly power with respect to AndroGel 1%.  Defendants' illegal conduct, calculated and designed to prevent, delay, and/or minimize the success of competition from any generic version of AndroGel 1%, enabled Defendants to continue charging supra-competitive prices for AndroGel 1% and AndroGel 1.62% without a substantial loss of sales.

173.    If manufacturers of generic AndroGel 1% had been able to enter the market and fairly compete with Defendants in a full and timely fashion, Plaintiffs and members of the Class would have substituted lower-priced generic AndroGel 1% for some or all of their AndroGel 1% and/or AndroGel 1.62% requirements, and/or would have received lower prices on some or all of their remaining branded AndroGel 1% and/or AndroGel 1.62% purchases, at earlier periods of time and/or in far greater quantities, and/or would have been able to purchase generic AndroGel 1% at lower prices than they actually did.

174.    During the relevant period, Plaintiffs and members of the proposed Class purchased substantial amounts of AndroGel 1% and AndroGel 1.62% directly from Defendants. As a result of Defendants' illegal conduct, alleged herein, Plaintiffs and the members of the proposed Class were compelled to pay, and did pay, artificially inflated prices for their AndroGel 1% and AndroGel 1.62% requirements. Plaintiffs and all other proposed Class members paid

prices for AndroGel 1% and AndroGel 1.62% that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (a) class members were deprived of the opportunity to purchase lower-priced generic AndroGel 1%  instead of expensive brand-name AndroGel 1% and AndroGel 1.62% ; and/or (b) the price of branded AndroGel 1% and AndroGel 1.62% was artificially inflated by Defendants' illegal conduct.

175.    Defendants' sham litigation was undertaken with the specific intent to monopolize the market for AndroGel 1%  in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## XIV.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs Value Drug Company and Rochester Drug Co-Operative on behalf of itself and the Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare Plaintiffs Value Drug Company and Rochester Drug Co-Operative as representatives of the Class;

B.    Enter joint and several judgments against the defendants and in favor of Plaintiffs Value Drug Company and Rochester Drug Co-Operative and the Class;

C.    Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial; and

D.    Award Plaintiffs Value Drug Company and Rochester Drug Co-Operative and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

## XV.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs Value Drug Company and

Rochester Drug Co-Operative, on behalf of themselves and the proposed Class, demands a trial

by jury on all issues so triable.

Dated:  July 2, 2018                                    Respectfully submitted,


                                                        /s/
                                                        David F. Sorensen (PA 57766)
 Bruce E. Gerstein                                      Ellen T. Noteware
 Joseph Opper                                           Nicholas Urban (PA 307129)
 Elena K. Chan                                          BERGER & MONTAGUE, P.C.
 GARWIN GERSTEIN & FISHER LLP                           1622 Locust Street
 88 Pine Street, 10th Floor                             Philadelphia, PA 19103
 New York, NY 10005                                     Phone: (215)-875-4683
 Phone: (212) 398-0055                                  dsorensen@bm.net
 bgerstein@garwingerstein.com                           enoteware@bm.net
 jopper@garwingerstein.com                              nurban@bm.net
 echan@garwingerstein.com

                                                        Peter Kohn
 Susan Segura                                           FARUQI & FARUQI, LLP
 SMITH SEGURA & RAPHAEL, LLP                            101 Greenwood Avenue, Ste. 600
 3600 Jackson St., Ste. 111                             Jenkintown, PA 19046
 Alexandria, LA 71303                                   Phone: (215) 277-5770
 Phone: (318) 445-4480                                  pkohn@faruquilaw.com
 sseggura@ssrllp.com
                                                        *Counsel for Rochester Drug Co-Operative, Inc.*
 John Gregory Odom
 Stuart Des Roches
 Andrew Kelly
 Dan Chiorean
 ODOM & DES ROCHES
 Poydras Center
 650 Poydras Street, Suite 2020
 New Orleans, LA 70130

Phone: (504) 522-0077
jodom@odrlaw.com
stuart@odrlaw.com
akelly@odrlaw.com
dchiorean@odrlaw.com

Russell A. Chorush
HEIM PAYNE & CHORUSH LLP
Chase Tower
1111 Bagby, Suite 2100
Houston, TX 77002
Phone: (713) 221-2000
rchorush@hpcllp.com
mjones@hpcllp.com

*Counsel for Value Drug*
  *Company*